# UNITED STATES DISTRICT COURT

_____ Middle _____ DISTRICT OF _____ Tennessee _____

UNITED STATES OF AMERICA
V.

JESSE SANTO PECORA,
AUSTIN MICHAEL EVANS, and
RODNEY EUGENE WHITAKER

(Name and Address of Defendant)

CRIMINAL COMPLAINT

Case Number: **10-2124 MK**

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about __11/1/10 and 12/16/10__ in __Davidson__ County, in the __Middle__ District of __Tennessee__ defendant(s) did,
(Date)

(Track Statutory Language of Offense)
combine, conspire, confederate and agree with each other and with other persons unknown to knowingly and intentionally possess with the intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance.

in violation of Title __21__ United States Code, Section(s) __846 and 841(a)(1)__.

I further state that I am a(n) __Speical Agent, ATF__ and that this complaint is based on the following facts:
                                Official Title

See attached Satement in Support of Criminal Complaint.

Continued on the attached sheet and made a part of this complaint: ☒ Yes ☐ No

_____
Signature of Complainant

Mickey L. French, Jr., Special Agent ATF
Printed Name of Complainant

Sworn to before me and signed in my presence,

12/17/2010                                            at     Nashville, Tennessee
Date                                                         City                State

E. CLIFTON KNOWLES        U.S. MAGISTRATE        _____
Name of Judge             Title of Judge         Signature of Judge

# STATEMENT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mickey L. French, Jr., having first been sworn upon his oath, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco and Firearms & Explosives (A.T.F.), and have been employed for approximately nine (9) years. I am currently assigned to the Nashville VCIT (Violent Crime Impact Team), Tennessee Field Division, Nashville, Tennessee. Prior to my employment with A.T.F., I was employed for approximately seven (7) years as a Special Deputy Sheriff / Firearms Examiner with the Indianapolis-Marion County Crime Laboratory.

2. This affidavit is submitted in support of a Criminal Complaint for the arrest of Jesse Santo PECORA, a/k/a Jay, Austin Michael EVANS, a/k/a Mikie, and Rodney Eugene WHITAKER for conspiring to possess with the intent to distribute five (5) kilograms or more of cocaine, in violation of Title 21, United States Code Section 846 and Title 21, United States Code, Section 841(a)(1). Since this affidavit is for the limited purpose of establishing probable cause to support the Criminal Complaint, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and the events described in this affidavit.

3. The statements made in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) review of consensually monitored and/or recorded conversations; (d) criminal history records maintained by various law enforcement agencies, Metropolitan Nashville Police Department (MNPD) and the National Criminal Information Center ("NCIC"); and (e) the training and experience of myself and other law enforcement agents and officers.

4. To the extent that consensually recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation that was recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. All quotations from recorded conversations are based upon preliminary transcriptions of those conversations and/or from the Affiant having personally listened to the recordings. In addition, the participants in many of these communications involved the use of slang terms, and code words. Those code words and slang terms, as well as communications in general, are analyzed to their meaning in this Affidavit based upon information from (a) the CI, (b) my training, experience and knowledge of this investigation, (c) other law enforcement officers' training, experience and knowledge of this investigation, and (d) other evidence gathered during the course of the investigation, such as

1

physical surveillance.

5. Part of the information contained in this affidavit is based on information provided by a CI. The CI has been providing information to law enforcement officers since June of 2009. The CI has participated in at least five (5) Federal investigations with ATF, for firearms-related offenses. Based on my experience and interactions with the CI, I have found the CI to be reliable. Among other things, the information that the CI has provided to law enforcement officers regarding his/her in-person conversations with the target(s) of the investigation has been corroborated through surveillance and the electronic recordings of some of those conversations. In addition, the CI has made monitored telephone calls to the targets of the investigation, as well as introducing and ATF Special Agent in an undercover capacity (UC). This affiant is not aware of any pending State or Federal charges against the CI. Law enforcement officers believe that the information provided by the CI has been credible because it has been corroborated through monitored and recorded undercover meetings ATF agents have participated in, as further described below.

6. In August of 2010, the Affiant received information from said CI that JESSE PECORA was the leader of an experienced armed home invasion robbery crew operating in the Nashville, TN area. The affiant received information that PECORA was looking for a new "ringleader" to operate and run his home invasion crew. According to the CI, PECORA's former "ringleader" was arrested for firearms and narcotics violations recently. PECORA later informed the CI that he had identified two (2) "licks" in and around Nashville, Tennessee - one a jewelry salesman and another being a residence full of firearms. PECORA later drove the CI to the residence of the jewelry salesman and provided him/her with details of the inside of the residence and identified a large black toolbox containing over $250,000.00 worth of expensive watches.

7. On September 8, 2010, the CI conducted a consensually monitored telephone call with PECORA, whereupon PECORA identified a black male named Keyona LNU that would assist the CI in the home invasion of the jewelry salesman. The CI and PECORA discussed payment to Keyona LNU for assisting in the home invasion, alarms on the residence and how to execute this home invasion. PECORA then offered to provide the CI with a firearm that he had inside his safe for the home invasion. PECORA further informed the CI that he had been watching the residence and suggested that the CI take the watches and not the toolbox, because it was too big.

8. Upon receiving the aforementioned information from the CI, ATF Agents made contact and interviewed SA, owner of the residence identified by the CI through PECORA. SA stated that he is a jewelry salesman, specifically dealing in expensive watches. SA stated that he conducts business with clients all around

2

the United States and that he regularly conducts business with watch manufacturers in the United States and Europe. SA stated that he operates his business from his residence and maintains his watch inventory inside a large black toolbox. SA stated that very few individuals know of his watch business and mentioned that he had recently met an unidentified person who owned and operated a limousine company for ride home. SA stated that the unidentified person mistakenly became aware of his watch business. SA provided a physical description of the unidentified person. ATF then identified Touch of Class Limo as a business owned and operated by PECORA.

9. ATF and MNPD requested SA secure his jewelry and report any suspicious activity to MNPD. ATF then directed the CI to thwart the proposed home invasion of the jewelry salesman with PECORA. ATF additionally notified MNPD to provide additional police patrols in the area.

10. On October 25, 2010, MNPD responded to a home invasion at the residence of SA. SA reported that he was asleep in an upstairs bedroom when he heard a loud noise. As he was attempting to get up, a white male and a black male wearing ski masks placed a knife in his back and threatened to kill him if he said anything. SA stated that he was beaten and duct taped and placed in the upstairs bathroom. SA stated that he eventually broke free and proceeded downstairs when he was again beaten and tied up in the downstairs bathroom. SA reported that approximately $50,000.00 worth of watches, a television, three cameras and other miscellaneous electronics equipment were stolen.

11. On October 26, 2010, PECORA notified the CI and informed him/her that the "lick" in Hermitage was done and that he had a shotgun for sale. PECORA refused to discuss the home invasion over the phone with the CI, but described the firearm for sale as a Saiga brand .410 gauge semi-automatic shotgun and that he wanted $600.00 for it. The CI negotiated a price of $450.00 with PECORA for the shotgun.

12. On October 27, 2010, the CI conducted a consensually monitored telephone call to PECORA. The CI informed PECORA that he/she was ready to purchase the shotgun. PECORA responded that he was "gonna send him to you with it," referring to an unidentified third party. The CI then asked PECORA about the home invasion in Hermitage, and PECORA responded, "Yeah, it's done". The CI and his/her vehicle were searched with no contraband found. The CI was equipped with an audio recording device, and surveillance units video-taped the undercover purchase. The CI was provided $450.00 agent cashier money. ATF agents conducted a buy/walk purchase of the shotgun utilizing the CI, whereupon PECORA sent a subject identified as Austin Michael EVANS to a pre-determined location in East Nashville. Surveillance units observed EVANS arrive and remove the shotgun from the trunk of his 1978 yellow Mercedes

3

wrapped in a sheet. The CI purchased the shotgun, described as an Ishmash Saiga brand .410 gauge shotgun for $450.00. The CI engaged EVANS in conversation regarding the home invasion in Hermitage, but EVANS stated that he did not know anything about it. The CI then instructed EVANS to inform PECORA that the CI might have a buyer for any watches or firearms for sale. The CI then met with ATF agents and turned over the shotgun. The CI and his/her vehicle was again searched with no contraband or money found.

13. Later on October 27, 2010, EVANS telephoned the CI and informed him/her that he had four (4) cameras for sale and provided descriptions of them. The CI agreed to bring his/her contact from the pawn shop to meet with EVANS the next day to purchase the cameras.

14. On October 28, 2010, the CI and an undercover ATF agent (UC) met with EVANS. Prior to the undercover operation, the CI was searched, and no contraband or money was found. Both the CI and the UC were equipped with audio recording devices, and the operation was video-taped by surveillance units. EVANS met the CI and the UC at a pre-determined location, whereupon the UC purchased three (3) cameras inside a black Canon brand bag from EVANS for $800.00. ATF agents determined that these three (3) cameras and the Canon bag were stolen on October 25, 2010 from SA during the home invasion orchestrated by PECORA. During the undercover operation, EVANS admitted to the CI that he was one of the persons responsible for the home invasion in Hermitage and that he "knocked it out quick." EVANS further stated that what "Jay" (PECORA) said was going to be there wasn't there, but advised that "the watches were there, but they weren't Rolexes."

15. On October 30, 2010, EVANS contacted the CI regarding numerous firearms for sale, and EVANS stated that he was conducting a "lick" in Knoxville, Tennessee soon. The CI made arrangements to meet with EVANS on November 1, 2010. On November 1, 2010, the CI consensually telephoned EVANS who stated that he had a .22 caliber revolver and some power tools for sale and agreed to meet with the CI later that day.

16. Later on November 1, 2010, the CI conducted a consensually monitored phone call to PECORA, informing him that his contact with the pawn shop was looking for some jewelry or firearms to "flip" for profit real quick. PECORA agreed to meet with the CI's contact. The CI and his/her vehicle were searched and no contraband or money was found. The CI and the UC were equipped with an audio-recording device, and the undercover operation was video-taped by surveillance units. The CI and UC met with PECORA at a public restaurant located in Nashville. During this meeting, the UC asked PECORA if he had anything to sell and PECORA produced his cellular phone and displayed a picture of a nine-shot, .22 caliber revolver with yellow grips to the UC and stated that he

4

wanted $225.00 for the revolver. The UC then asked PECORA if he was interested in conducting a home invasion. The UC told PECORA that he provided security for a drug trafficking organization and was disgruntled and needed a robbery crew to commit an armed robbery for the purpose of obtaining at least ten (10) kilograms of cocaine. In this regard, the UC explained to them that there are always two (2) men guarding the cocaine who are armed. During the course of this meeting, the UC agent explained to PECORA that he expected to be provided a one-half (1/2) "cut" of the proceeds from the robbery. According to the UC, PECORA appeared to be the leader of an armed robbery crew and asked several questions of the UC regarding the particulars surrounding the proposed robbery. PECORA asked the UC several questions pertaining to details of the stash house floor plan, possible counter-surveillance, and all persons inside the stash house. PECORA told the UC that he and his crew were very experienced at this type of crime and reassured the UC that he knew what he was doing. PECORA stated that he could sell the cocaine with no problem and even mentioned a prior "lick" involving kilograms of cocaine that he had participated in and profited from. PECORA informed the UC that he could sell the kilograms of cocaine for $15,000.00 each. At the conclusion of the meeting, PECORA expressed his desire to participate in the home invasion and agreed to later meet with the UC to further discuss the proposed home invasion. PECORA additionally informed the UC that when he had something for sale he would send someone with it, because he did not want to possess illegal items as it presented "too much risk."

17. Later that same day, the CI conducted several consensual telephone calls with PECORA and EVANS regarding the proposed sale of the .22 caliber revolver, and a meeting was arranged. Prior to the meeting, the CI and his/her vehicle were searched, and no contraband or money was found. The CI and the UC were equipped with an audio-recording device, and the undercover operation was video-taped by surveillance units. During the operation, the CI purchased a High Standard, model Sentinel, nine-shot, .22 caliber revolver from EVANS for $220.00 at a pre-determined location. EVANS admitted to the CI during the operation that the revolver was stolen. The CI stated that EVANS additionally possessed numerous Dewalt brand power tools in the trunk of his 1978 yellow Mercedes that he wanted to sell to the CI's contact with the pawn shop. The CI then met with ATF agents and turned over the revolver. The CI and his/her vehicle were again searched with no contraband or money found.

18. On November 18, 2010, the CI received a telephone call from EVANS, who stated that he had a shotgun, a rifle and a two-shot pistol for sale for $600.00. On November 19, 2010, an attempt to meet with PECORA was unsuccessful between the UC and the CI.

5

19. On November 30, 2010, the CI contacted PECORA to arrange a meeting with the UC on December 1, 2010. PECORA informed the CI that the UC had only purchased two firearms (referring to the Ishmash Saiga brand .410 gauge shotgun and the High Standard, nine-shot, .22 caliber revolver) from him and that until he purchased these additional three firearms (previously offered by EVANS on November 18, 2010), he did not want to do business with the UC. PECORA emphasized that he wanted to do business with the UC to develop some trust. Later that evening, PECORA by phone instructed the CI to notify him when the UC was in town and that he would meet him.

20. On December 1, 2010, the CI conducted a consensually monitored phone call with PECORA. PECORA additionally spoke with the UC during this phone call, and PECORA agreed to send an unidentified third party to meet with the CI and UC to sell some firearms. The CI was searched, and no contraband or money was found. The CI and the UC were equipped with audio-recording devices. PECORA directed EVANS to deliver the firearms to a pre-determined location. The UC purchased (1) a FMJ, model O/U, .22/.45 caliber derringer; (2) a Henry Repeating Arms Company, model H001, .22 caliber rifle; (3) a Mossberg, model 500A, 12-gauge shotgun; and (4) a New England Firearms, model Pardner, single-shot, 20-gauge shotgun for a total of $600.00. EVANS delivered these firearms to the meet location in his 1978 yellow Mercedes. ATF agents determined that the Henry Repeating Arms Company, .22 caliber rifle was stolen on November 26, 2010 and that the New England Firearms 20-gauge shotgun was sawed off illegally, measuring 21 ¾ inches overall and having a barrel length of 14 11/16 inches. At the completion of the firearms purchase, EVANS requested the CI walk to his vehicle, whereupon EVANS gave the CI $50.00 for setting up the purchase. EVANS then asked the CI if the fifteen (15) "keys" was for real, referring to the proposed home invasion for kilograms of cocaine previously proposed by the UC to PECORA. The CI provided the $50.00 to the UC and then consensually telephoned PECORA to meet. PECORA requested to search the CI and UC prior to any meet for "wires" and further requested that the CI and UC leave all phones out of the meeting. PECORA also wanted the CI and UC to only wear t-shirts.

21. Later on December 1, 2010, in furtherance of this conspiracy, PECORA and EVANS met with the CI and the UC at a public restaurant in Nashville. During this meeting, the UC confirmed that PECORA and EVANS were aware of the purpose of the meeting, which was the proposed armed robbery of at least ten (10) kilograms of cocaine from the stash house. The UC explained that he conducted security for a drug trafficking operation and that he was disgruntled and wanted to contract an experienced armed robbery crew to rob his source of cocaine supply in Nashville. The UC explained the method in which he guards a cocaine operation on a regular basis. The UC explained that "Oso," the armed guard, and "Flaco," the cocaine distributor, would be located within the residence

and that he (UC) would guard the exterior door. The UC told PECORA and EVANS that they did not have to commit this robbery and, if they did not want to or were not able to do so, to let him know, and he would recruit another robbery crew for this particular job. PECORA and EVANS said they were interested in committing this robbery, and both expressed a desire to participate in the home invasion. The UC told PECORA and EVANS that it was very important the narcotics trafficking organization members did not find out who had committed the robbery of their stash house. PECORA and EVANS told the UC that they knew what to do and further explained methods, such as macing, that could be utilized to subdue "Oso" and "Flaco" once inside the residence. PECORA and EVANS told the UC that they have participated in similar armed robberies such as the one the UC was proposing. EVANS even mentioned, "I want to do it right now" and affirmed his willingness to participate. The UC requested that PECORA and EVANS tie him (UC) up with zip ties upon entering the residence to make it look good. PECORA requested that the UC provide two black Suburbans and police gear to make the home invasion look like a police SWAT operation. PECORA mentioned that he wanted to get comfortable with the UC prior to the operation. The UC requested to meet with the remainder of PECORA's crew in the near future.

22. On December 6, 2010, PECORA telephoned the UC and offered to sell him a bullet proof vest, a muzzleloader rifle and sixty (60) Lortab pills and wanted to meet with him again to discuss the proposed home invasion. The UC arranged a meeting for December 7, 2010.

23. On December 7, 2010, PECORA and EVANS met with the UC at a public restaurant in Nashville. The UC was equipped with an audio-recording device and surveillance units video-taped the undercover operation. The UC again further discussed the proposed armed robbery of at least ten (10) kilograms of cocaine. The UC, PECORA and EVANS discussed the schematics of the residence, points of entry, and where "Oso" and "Flaco" would be located within the residence. The UC explained that the cocaine would be in two locations - one being the kitchen for the next delivery and the second being the nearest closed room. The UC explained that "Oso" would be armed with a firearm and would not hesitate to pull his firearm and that it would be important for PECORA's crew to be armed appropriately. During the operation, PECORA sold the UC a bullet proof vest and a BPI Connecticut Valley Arms, model Eclipse, .50 caliber muzzle loader rifle. PECORA admitted to the UC that he had sold the sixty (60) Lortab pills prior to this meeting. PECORA requested that the UC keep the bullet proof vest so that he (PECORA) could utilize it during the proposed home invasion. PECORA further requested that the UC provide the two black Suburbans and stated that he wanted them the day prior so that he could disengage the GPS units within the vehicles.

24. The UC then discussed a fictitious armed robbery he committed on a marijuana distributor in which he sent a girl to the residence who identified a large sum of cash. The UC stated that his crew then robbed the marijuana distributor. When the UC finished this story, PECORA mentioned "that's exactly what I do," referring to prior armed robberies he has committed. At the conclusion of the meeting, PECORA requested that the UC give his Chevrolet Z71 truck to PECORA as additional compensation for conducting this home invasion. The UC informed PECORA that he needed to meet the rest of his crew and ensure they were willing to complete this armed robbery. The UC explained that he needed to meet PECORA's crew so he could see in their eyes their willingness to participate in this home invasion. The UC informed PECORA that the cocaine may arrive next week, and PECORA agreed to talk with his crew this weekend. The UC asked PECORA if he could obtain some "H," referring to Heroin, and PECORA stated that he could obtain and sell the UC several grams next week. The UC informed PECORA that they would again meet with his crew next week.

25. On December 12, 2010, the UC contacted PECORA and informed him that he had received a call that the cocaine would arrive in Nashville later this upcoming week. The UC asked PECORA if he and his crew were ready, and PECORA responded that he was ready and wanted to know if the UC was ready.

26. On December 15, 2010, PECORA telephoned the UC and asked about obtaining the two Suburbans so that he could disable the GPS units inside the vehicles prior to the home invasion. The UC explained that PECORA would have access to the two vehicles on December 16, 2010 prior to the home invasion for a couple of hours. The UC asked PECORA if his crew was ready and willing to participate, and PECORA again stated that he wanted in. The UC instructed PECORA to get his crew and "tools" (firearms) ready and that he (UC) would telephone him at 10 am on December 16, 2010. The UC then provided PECORA and option not to participate if he was not ready or willing to do so. PECORA again stated that he was ready.

27. On December 16, 2010, the PECORA telephoned the UC and wanted an update for the proposed home invasion. The UC informed PECORA that he would telephone around 11 am. The UC was equipped with an audio recording device, and surveillance units video-taped the operation. At approximately 11:20 am, the UC telephoned PECORA and left a message. At approximately 11:30 am, PECORA placed a phone call to the UC. The UC made arrangements for PECORA and his crew to meet at a pre-determined location in South Nashville. Shortly after 12:00 pm, PECORA arrived, accompanied by EVANS and WHITAKER in EVANS 1978 yellow Mercedes. The UC engaged PECORA in a short conversation and asked if they had brought their firearms. EVANS responded that they had them. PECORA entered the UC's vehicle and directed

8

EVANS and WHITAKER to follow him to a nearby storage unit.

28. At approximately 12:13 pm, the UC, PECORA, EVANS and WHITAKER arrived at the storage unit and began discussing the home invasion. The suspects surrounded the UC and discussed the scenario for committing the armed robbery of cocaine at the stash house. The UC told the suspects there would be at least ten (10) kilograms of cocaine in the stash house and mentioned that there were twenty-three (23) kilograms last time. The UC further told the suspects there would be at least two armed guards, "Oso" and "Flaco." The UC informed the suspects that they would need to pull a gun on the armed guards immediately. The UC then asked who had the firearms, and both EVANS and WHITAKER indicated they were armed. WHITAKER questioned the UC on who watched the door of the stash house, and the UC indicated it would be him. The UC provided the suspects with locations of the cocaine and mentioned that if the cocaine was duct-taped together not to separate it by hand, but to use a knife due to acid around the packages that would burn their skin. The suspects indicated to the UC that they may use mace on the armed guards. The UC directed them to use the mace on him (UC) too and also to hit him on the way out to make it look good. WHITAKER acknowledged to the UC that he wanted to participate in the home invasion. The UC made him aware of the agreed upon split of cocaine/profits, which WHITAKER indicated was agreeable to him.

29. At the end of the conversation, PECORA indicated that he would be picking up a fourth unidentified person to assist in the home invasion. PECORA additionally indicated that he wanted to purchase a case of contraband cigarettes located within the UC vehicle, removed the case, and offered to pay the UC at a later date. The UC addressed the suspects and explained that he wanted them to bring his "cut" of the proceeds back to the storage unit, and PECORA suggested that the UC obtain a larger unit so that they might be able to hide a vehicle. The UC then walked away from the suspects, and a law enforcement take-down and arrest was conducted. PECORA and WHITAKER immediately complied and were taken into custody without incident. EVANS fled on foot and was subsequently arrested. Upon search incident to arrest, a large knife was located in EVANS vehicle, along with a small blue bag containing a roll of duct tape.

30. All of the described events occurred in Davidson County, located in the Middle District of Tennessee.

9

31.     Based upon the foregoing information, your affiant submits there is probable cause to believe that Jesse Santo PECORA, Austin Michael EVANS, and Rodney Eugene WHITAKER have committed the offense of conspiracy to possess with the intent to distribute five (5) kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

Further affiant sayeth not.

_____
MICKEY L. FRENCH, JR.
Special Agent, ATF

Sworn and subscribed before me this the 17th day of December, 2010.

_____
E. CLIFTON KNOWLES
U.S. Magistrate Judge

10